UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 1:14-CR-324 |
| | : | |
| v. | : | |
| | : | (J. Jones   ) |
| JAY FINDLING, a/k/a Jay Finn, and | : | |
| TIMOTHY P. FOSTER | : | |

# INFORMATION

The U.S. Attorney Charges:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

**A. Introduction**

1. At all times relevant to this Information, Timothy P. Foster (Foster) was employed as a Vice President of the Rite Aid Corporation (Rite Aid), a publicly owned, national drug store chain headquartered in Camp Hill, PA. While Foster was employed by Rite Aid, he worked out of company offices in Portland and Beaverton, Oregon.

2. Foster's duties at Rite Aid included the liquidation of surplus Rite Aid inventory across the United States. Foster was responsible for finding a buyer for

Page 1 of 8

the product, negotiating its sale, invoicing the buyer for the inventory, and accurately reporting the sale to Rite Aid.  As an officer of Rite Aid, Foster owed a fiduciary duty to render honest services to the company, its board of directors and its shareholders.  As such, Foster was not entitled to receive or retain any portion of the sales proceeds for himself or otherwise financially benefit from the sale of the surplus inventory.

3. At all times relevant to this Information the defendant, one Jay Findling, a/k/a Jay Finn (Findling), owned and operated a wholesale inventory sales business by the name of J. Finn Industries, LLC (J. Finn Industries).  J. Finn Industries was headquartered in Morganville, NJ.

**B.     The Conspiracy To Commit Wire Fraud Scheme**

4. Between 2001 and 2010 Foster and Findling conspired to perpetrate a wire fraud scheme that had two distinct objectives and purposes: 1) to defraud Rite Aid by depriving it of Foster's honest services, and 2) to obtain Rite Aid's money and property by means of false and fraudulent pretenses and representations.  The scheme involved Foster's and Findling's sale of surplus Rite Aid inventory to third parties, their reporting and submission of false, lower inventory sales proceeds to the company, Findling's conversion of the proceeds to his own use, and Foster's breach of his fiduciary duty to Rite Aid by accepting kickbacks from Findling.

**C.     Manner and Means**

5. The conspiracy to commit wire fraud scheme was perpetrated by Foster and Findling through the use of two different manner and means; one involving the inventory buyer's receipt of a Rite Aid invoice and the other involving the buyer's receipt of an invoice from J. Finn Industries. The manner and means involving the buyer's receipt of an invoice from Rite Aid operated as follows:

    a) On or about March of 2001, Findling opened a bank account under the name of J. Finn Industries, d/b/a "Rite Aid Salvage Liquidation" at the Citibank in New Jersey. The account was solely controlled by Findling and Rite Aid was unaware of its existence.

    b) When Foster reached an inventory sales agreement he would send the buyer a Rite Aid invoice and instruct the buyer to wire payment directly to the "Rite Aid Salvage Liquidation" account or to send a check payable to "Rite Aid Salvage Liquidation" to Foster in Oregon. If Foster received a check, he would forward it to Findling who would deposit it in the "Rite Aid Salvage Liquidation" account. Findling would then transfer the buyer's payment from the "Rite Aid Salvage Liquidation" account to a J. Finn Industries business account.

    c) Foster would then notify Rite Aid by e-mail that the inventory had been sold, not for the actual sales price, but for a false, lower price. Typically, the false sales price was 10-30% lower than the actual price.

    d) Foster would then send Findling a Rite Aid invoice for the inventory at the false, low price and Findling would wire payment to Rite Aid in that amount. Having been lead to believe the inventory had been purchased by Findling instead of the real buyer, Rite Aid would send Foster an e-mail confirming receipt of Findling's payment. Later, Findling would kickback a portion of the money he received from the buyer to Foster.

6. The manner and means involving the inventory buyer's receipt of an invoice from J. Finn Industries operated as follows:

    a) Foster would advise Findling what surplus Rite Aid inventory was available for sale and Findling would attempt to find a buyer for the product. When a sales agreement was reached, Findling would send the buyer a J. Finn Industries invoice for the goods even though Findling did not own the inventory.

    b) After Findling received payment from the buyer, Foster would send Findling a Rite Aid invoice for a lower amount, Foster would report the sale of the inventory to Rite Aid at the lower amount by e-mail, and Findling would wire payment in that amount to Rite Aid. Having been lead to believe the inventory had been purchased by Findling instead of the real buyer, Rite Aid would send Foster an e-mail confirming its receipt of Findling's payment. Later, Findling would kickback a portion of the money he received from the buyer to Foster.

7. Between 2001 and 2010 Findling received at least $87.4 million from the sale of surplus Rite Aid inventory as described above. Of this amount, Foster only reported to Rite Aid and Findling only paid Rite Aid approximately $72.8 million. Of the approximate $14.6 million Findling profited from these sales, Findling kicked back at least $2,941,940 to Foster.

8. In order to conceal their scheme to defraud, Findling paid Foster's kickbacks with cash. Findling's deliveries of cash to Foster varied in amount and frequency. The cash exchanges took place at various locations in Pennsylvania, New Jersey and Maryland.

9. Findling also concealed some of his kickbacks to Foster by issuing J. Finn Industries checks to third parties. Between August of 2001 and May of 2002 Findling wrote 16 checks totaling $417,942 to companies controlled by members of Foster's family. Proceeds from these checks were eventually distributed to Foster.

**D.    The Conspiracy**

10. Between February of 2001 and February of 2010, in the Middle District of Pennsylvania and elsewhere, the defendant,

**JAY FINDLING, a/k/a Jay Finn,**

did conspire and agree to commit an offense against the United States, to wit; Findling and Foster devised and perpetrated a scheme and artifice to defraud Rite Aid by 1) obtaining Rite Aid's money and property by means of false and fraudulent pretenses, representations and promises by knowingly causing to be transmitted in interstate commerce wire communications for the purpose of executing the scheme, and 2) depriving it of the right to honest services of Vice President Foster, violations of 18 U.S.C. Section 1343 and 1346.

**E.    Overt Acts In Furtherance of the Conspiracy**

11. The following wire transfers sent by Findling to Rite Aid as payment for surplus Rite Aid inventory constituted overt acts in furtherance

of the Conspiracy's objectives:

| Overt Act | On or About | Rite Aid Inventory Purchased By | Buyer's Payment deposited Into J. Finn Industries d/b/a "Rite Aid Salvage Liquidation" Account | Wire Transfer Payment Sent to Rite Aid By Findling |
|---|---|---|---|---|
| a) | 09/08/09 | Big Lots | $30,330 | $25,770 |
| b) | 09/22/09 | Big Lots | $103,685 | $93,317 |
| c) | 09/22/09 | Big Lots | $109,648 | $95,394 |
| d) | 09/29/09 | West Coast Closeout | $42,368 | $36,692 |
| e) | 10/21/09 | Liquidation World Inc. | $86,259 | $70,024 |
| f) | 12/09/09 | Talon Wholesale Inc. | $89,054 | $80,149 |

**All in violation of Title 18, United States Code, Section 371.**

## **NOTICE OF FORFEITURE**

1. The allegations contained in Count 1 of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction for Conspiracy to violate the Wire Fraud Statute, a violation of 18 U.S.C. Section 371, the defendant,

**JAY FINDLING,**
a/k/a Jay Finn

shall forfeit to the United States of America property, real or personal, which constitutes or is derived from proceeds traceable to said violation, specifically **$11,629,091** in United States Currency.

The U.S. Attorney Further Charges:

## COUNT TWO
### (False Statements)

For purposes of Count Two, the information and allegations set forth in Count One are specifically incorporated herein.

On or about January 29, 2014, in the District of Arizona, the defendant,

**TIMOTHY P. FOSTER**

did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the United States government, to wit; in that Foster, a former Rite Aid, Inc. Vice President, knowingly and willfully lied during an interview with Special Agents from the Federal Bureau of Investigation (FBI) when he denied that he conspired with Jay Findling to defraud Rite Aid via a surplus inventory sales, kickback scheme when Foster did, in fact, conspire with Findling to perpetrate such a scheme between 2001 and 2010 that caused Rite Aid to sustain at least $14.6 million in losses and yielded Foster no less than $2,941,940 in kickbacks.

**All in violation of Title 18, United States Code, Section 1001(a)(2).**

_____ per AUSA KDS
PETER J. SMITH
United States Attorney
Middle District of Pennsylvania

Date: 12/18/14

Page 8 of 8